FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION** 2018 APR 13 PM 3: 40

| | |
|---|---|
| **CLUB EXPLORIA, LLC and** | § |
| **CLUB EXPLORIA MANAGEMENT, LLC** | § |
| **f/k/a SUMMER BAY MANAGEMENT, L.C.,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **vs.** | § |
| | § |
| **AARONSON, AUSTIN, P.A. d/b/a** | § |
| **AARONSON LAW FIRM and** | § |
| **AUSTIN N. AARONSON,** | § |
| | § |
| **Defendants.** | § |

**CIVIL ACTION NO.**

6:18-cv-576-ORL-28-DCI

## PLAINTIFFS' COMPLAINT

Plaintiffs Club Exploria, LLC ("Club Exploria") and Club Exploria Management, LLC

f/k/a Summer Bay Management, L.C. ("CEM" and together with Club Exploria "Plaintiffs") file

their Complaint against Defendants Aaronson, Austin, P.A. d/b/a Aaronson Law Firm

("Aaronson Firm") and Austin N. Aaronson ("Aaronson," and together with the Aaronson Firm,

"Defendants").

### I.      PARTIES

1.      Club Exploria is a Delaware limited liability company with its principal place of

business in Lake County, Florida.

2.      CEM is a Florida limited liability company with its principal place of business in

Lake County, Florida.

3.      Aaronson is an individual domiciled in Seminole County, Florida, and is not a

United States military member.  He is President of the Aaronson Firm.  Upon information and

belief, Aaronson is the Aaronson Firm's sole shareholder.  In all respects, he directs and controls

each action taken and all conduct perpetrated by the Aaronson Firm. Aaronson is a Florida citizen who can be served with legal process at 2180 West State Road 434, Suite 6136, Longwood, Florida 32779 or wherever he may be found.

4.      The Aaronson Firm is a Florida for-profit corporation with its principal place of business at 2180 West State Road 434, Suite 6136, Longwood, Florida 32779, where it may be served with process through its registered agent, Aaronson. The Aaronson Firm is also a Florida citizen.

## II.     INTRODUCTION

5.      Developers like Club Exploria provide vacation resort opportunities by, *inter alia*, selling timeshare resort interests that allow purchasers to use the resort units during a specified time interval. Timeshare interest ownership allows individuals access to resort amenities for a fraction of the cost of owning their own vacation home or condominium outright. As with other real estate related products, consumers often finance their timeshare interest purchases over time. They also agree to pay their share of maintenance and other assessments related to the units ("Maintenance Fees") on a regular basis.

6.      Under Florida law, resort owners like Club Exploria and their timeshare-selling affiliates are required to make certain disclosures to purchasers, including those related to the 10-day time period during which one can cancel his or her purchase. Generally, timeshare purchasers who do not exercise their cancellation rights are satisfied with their purchase—a recent study commissioned by the American Resort Development Association ("ARDA") found that roughly eight in every ten timeshare purchasers would happily buy their timeshare interest again.

7.      Most consumers finance their timeshare interest purchases over time, thereby incurring ongoing obligations to the timeshare developer and others such as CEM. After months

and, in some instances, years of performing their contractual obligations, Affected Owners 1, 2, 3, 4, 5, and 6 (collectively "Affected Owners") hired Defendants to send Club Exploria and/or Summer Bay Partnership letters that adduce purported grounds for rescinding the Affected Owners' timeshare purchase.

8.      In recent years, the timeshare industry has seen the rise of a cottage industry of companies whose sole purpose is to entice timeshare owners to seek to "escape" the obligations related to their timeshare interests.  These "exit companies," like the Aaronson Firm, profit by convincing consumers that they have a purportedly "lawful" way to "escape" their obligations, without regard to whether there is any factual or other basis.

9.      Defendants encourage timeshare owners to pursue rescission without investigating the facts of their clients' situations.  In fact, the Aaronson Firm has been sanctioned twice within the last year for filing suit on behalf of timeshare owners based on a rescission theory that was directly contradicted by documents its clients signed in connection with purchasing their timeshare interests.

10.      Trading on their status as a law firm and a licensed lawyer, and using aggressive and dramatic marketing tactics, Defendants promise unsuspecting timeshare owners a supposed cure-all that is rarely, if ever, premised on a clients' underlying facts.  Instead, Defendants suggest that all timeshare owners have an automatic or inherent right to cancel their contractual obligations to pay—if only the consumer knows the right levers to pull.  Of course, this is not consistent with applicable law.  And because the Aaronson Firm and Aaronson are a law firm and licensed attorney, respectively, the advertising statements they make are evaluated against a higher standard.

11.     Defendants disregarded that standard and engaged in advertising practices that were, by definition, deceptive and misleading under the Florida Rules of Professional Conduct ("Rules"). For example, on the Aaronson Firm's website alone, Defendants: (1) used an actor to portray an Aaronson Firm lawyer in a video appearing on the Aaronson website without making the required disclosures (Rule 4-7.13 (b)(5)); (2) misrepresented the Aaronson Firm's lawyers' combined experience providing exit company services (Rule 4-7.13 (a)(1)); (3) had supposed actual clients read attorney-prepared testimonials regarding the Aaronson Firm (Rule 4-7.13 (b)(8)(A)); (4) made predictions to prospective clients as to the likelihood of achieving rescission of their timeshare interests (Rule 4-7.13 (b)(1)); (5) implied that they will file suit against timeshare developers exclusively in order to gain leverage during negotiations in violation of the Rules (Rule 4-7.13, Comment, Implying Lawyer Will Violate Rules of Conduct or Law); (6) made gratuitous appeals to the emotions of prospective clients by, among other things, calling timeshare developers sociopaths (Rule 4-7.15 (a)); and (7) omitted information regarding the narrow availability of timeshare purchasers' rescission rights in order prevent the law firm's other statements from being misleading (Rule 4-7.13 (a)(2)).

12.     As a result, at the time of this filing, Affected Owners 1, 3, and 5 have stopped making loan payments to Club Exploria and Affected Owner 2 and Affected Owner 5 have stopped making Maintenance Fees payments to CEM.   Affected Owners 4 and 6 hired Defendants to send correspondence to Club Exploria and/or Summer Bay Partnership alluding to fraud as grounds for rescinding their timeshare purchases.

13.     Defendants have not only tortiously interfered with Plaintiffs' ongoing contractual relationships with the Affected Owners, they have also engaged in a pattern of conduct using the mail and wires designed to defraud Plaintiffs out of the funds the Affected Owners owe Plaintiffs

under their contractual obligations. Defendants have also violated Florida's Deceptive and Unfair Trade Practices Act, and, through the Aaronson Firm's website, disseminated false and misleading information designed to induce the Affected Owners into hiring Defendants to Plaintiffs' detriment. Finally, through statements published on their website, Defendants have disparaged Club Exploria's business reputation.

### III.   JURISDICTION AND VENUE

14.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert a claim under the Lanham Act, 15 U.S.C. § 1125 (a), and the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962 (b)-(c). This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all state law claims asserted herein because they are so related to Plaintiffs' federal claims that they form a part of the same case or controversy.

15.   Venue is appropriate in this Court under 28 U.S.C. § 1391 in that each defendant resides, is located or does business in the state of Florida and in particular within the geographic confines of the Middle District of Florida, Orlando Division.

### IV.   FACTUAL ALLEGATIONS

**A.   The Affected Owners were longstanding, satisfied customers of Plaintiffs before they hired Defendants.**

16.   Club Exploria is the developer of the resorts in which the Affected Owners purchased timeshare interests. The Affected Owners purchased their timeshare interests pursuant to the terms of Club Purchase Agreements with Club Exploria and Summer Bay Partnership, the seller of the timeshare interest in the relevant resort. Affected Owner 1, Affected Owner 3, Affected Owner 5, and Affected Owner 6 financed their timeshare interest purchases in Club Exploria-owned resorts through purchase-money loans made by Summer Bay Partnership

pursuant to the terms of promissory notes. Club Exploria is the assignee of all Summer Bay Partnership's interest in, to, and under these promissory notes and related mortgages and all documents executed and delivered in connection with such notes and mortgages, including all consumer loan documents and files, all monies due and to be come due on account of such mortgages, and all rights accrued or to accrue under such mortgages and other documents.

17.     Pursuant to the terms of the Club Purchase Agreements and related documents, including but not limited to the Amended and Restated Declaration and Agreement of Trust ("Trust Declaration"), each of the Affected Owners agreed to make payments to CEM for Common Assessment Fees and Club Dues arising from ownership of their timeshare interests ("Maintenance Fees"). The Trust Declaration is incorporated by reference into the Club Purchase Agreements signed by each of the Affected Owners. Under the terms of the Trust Declaration, any Affected Owners' failure to timely pay Maintenance Fees to CEM gives rise to a direct claim by CEM against any such delinquent Affected Owner.

18.     The Affected Owners were not new timeshare owners who simply "didn't know what they were getting into." Rather, each of the Affected Owners 1, 2, 3, and 4 upgraded their initial purchases of Club Exploria timeshare interests and/or converted equity in one timeshare interest into two Club Exploria timeshare interests after years, if not decades, of making payments toward purchase-money financing extended by Summer Bay Partnership and contractual Maintenance Fees associated with their initial purchase.

19.     Affected Owner 1 annually upgraded his timeshare interests in Club Exploria resorts for over nine years and then suddenly defaulted on his loan payment obligations within months of when Plaintiffs first received correspondence purporting to unilaterally cancel his purchase of a timeshare interest in a Club Exploria resort.

20.     Affected Owner 2 first purchased an interest in a Club Exploria resort in 1995. After completely satisfying the loan he used to purchase his initial interest, Affected Owner 2 converted his equity in his initial timeshare interest into interests in two Club Exploria resort units.  Since January 2, 2018, Affected Owner 2 has been in default on his Maintenance Fees obligations associated with both timeshare interests.  Just weeks later, Club Exploria received rescission correspondence from Defendants that is similar to the correspondence they sent to Affected Owner 1.

21.     Affected Owner 3 upgraded his timeshare interest in a Club Exploria resort in December 2015.  Since January 2018, Affected Owner 3 has been in default on his loan payment obligations to Club Exploria and his Maintenance Fees payments to CEM.  Contemporaneous to Affected Owner 3's default, Defendants again sent Plaintiffs correspondence purporting to cancel Affected Owner 3's purchase.

22.     Affected Owner 4 first purchased an interest in a Club Exploria resort in 1995 and converted the equity he accumulated in that property into an interest in another Club Exploria resort in June 2017.  Plaintiffs received correspondence from Defendants accusing Plaintiffs of fraud in connection with closing the June 2017 upgrade.  Based on the foregoing pattern, Plaintiffs do not anticipate that Affected Owner 4 will make his next payment, as the Affected Owners are choosing to pay for Defendants' timeshare-relief services rather than pay Plaintiffs.

23.     Affected Owner 5 financed his August 2015 purchase of a timeshare interest in a Club Exploria-owned resort with a purchase-money loan pursuant to the terms of a Summer Bay Partnership's standard promissory note.  Weeks before Club Exploria received a phone call from Defendants on Affected Owner 5's behalf in November 2015, Affected Owner 5 stopped making loan payments to Summer Bay Partnership.  Just weeks after Defendants' phone call to Club

Exploria on Affected Owner 5's behalf, Affected Owner 5 defaulted on his Maintenance Fees payments to CEM.  Affected Owner 5 is still in default on his loan and Maintenance Fees payments.

24.     Affected Owner 6 financed his October 2016 purchase of a timeshare interest in a Club Exploria-owned resort with a purchase-money loan pursuant to the terms of a Summer Bay Partnership's standard promissory note.  As the assignee of Summer Bay Partnership's interest in Affected Owner 6's promissory note, Club Exploria recently received correspondence from Defendants on March 28, 2018 and April 9, 2018.  As is the case with Affected Owner 4, Plaintiffs do not anticipate that Affected Owner6 will make his next payment.

**B.     Defendants' timeshare-relief services purport to cancel the Affected Owners' interests based on theories Defendants know are meritless.**

25.     The timeshare-relief "services" that Defendants provided to the Affected Owners appear to consist, thus far, entirely of sending Plaintiffs letters that purport rescind the owners' timeshare interest and/or accuse Club Exploria and Summer Bay Partnership of fraud as grounds for rescission, regardless of the specifics of the given case.  Based on a review of Defendants' litigation history, a suit against Plaintiffs on the Affected Owners' behalves premised on the theories advanced in Defendants' letters, is imminent.  In light of prior sanctions orders finding that comparable rescission theories are frivolous, Defendants know that their claims are meritless but elect to proceed with their scheme.

26.     Defendants sent purported timeshare cancellation notices under Florida Statute § 721.10 (b) to Plaintiffs on behalf of Affected Owners 1, 2, and 3.  Section 721.10 (b) allows a purchaser to:

> . . . cancel the contract until midnight of the 10th calendar day following whichever of the following days occurs later:  (a) The execution date; or (b) The day on which the purchaser received the last of all documents required to be provided to him or her,

including the notice required by § 721.07 (d) [related to timeshare
public offering statements].

27.     Defendants claim that Affected Owners 1, 2, and 3 did not receive, in the exact
form required:  (1) the Public Offering Statement and required exhibits; (2) a receipt for
documents received indicating any exhibits not included; (3) an executed copy of any document
purchaser signs at closing; (4) a fully executed paper copy of the purchase contract; (5)
conveyance of timeshare estate title to the Affected Purchaser or clerk of court; and/or (6) a fully
executed paper copy of the purchase contract.

28.     Defendants imply that the 10-day window during which a purchaser has a right to
cancel a timeshare interest purchase has not begun to run because the Affected Owner has not
received all the required documentation in the form required under § 721.07 (b) of the Florida
Statutes.  Contrary to the allegations in Defendants' correspondence, Affected Owners 1, 2, and
3 executed the Club Exploria Receipt for Timeshare Documents and the Club Exploria Alternate
Media Disclosure Statement, in which they acknowledged receipt of the documentation required
under § 721.07(b) and consented to receive the same via USB drive.

29.     Defendants are aware that their attempt to extend the 10-day cancelation window
for periods of many months is without factual or legal foundation.  In response Defendants'
cancellation notice to Affected Owner 1, Club Exploria promptly provided Defendants with
excerpts from Club Exploria's standard Club Agreement, Terms and Conditions, Alternative
Media Disclosure, and Receipt for Timeshare Documents/Club Purchase Agreement showing
that Affected Owner 1 acknowledged receipt of the very information that Defendants claimed
had not been received and consented to the form in which it was provided.

30.     Defendants sent correspondence alleging that Plaintiffs defrauded Affected
Owner 3 into purchasing his timeshare interest by, among other things, (1) stating "this purchase

[will] appreciate in value similar to an investment in real estate, with associated tax benefits"; (2) stating Exploria "had a re-sale and rental program, and that the timeshare could easily be rented out to pay its maintenance fees"; (3) stating that the Affected Owner 3 could make reservations at international resorts without disclosing that he could only do so after paying additional points exchange fees; (4) engaging in high-pressure sales tactics; (5) depriving Affected Owner 3 of his ability to "digest" the documents they signed at closing; and (6) providing Affected Owner 3 limited access to properties that were "outdated" or "dilapidated." Defendants sent similar correspondence to Affected Owner 4 on March 19, 2018 and Affected Owner 6 on March 28, 2018 and April 9, 2018.

      31.    These allegations resemble those made on Defendants' website advertising and are in no way rooted in any factual investigation conducted by Defendants. Undermining Defendants' unvetted rescission theories, Plaintiffs reminded Defendants that the Affected Owners expressly agreed that "BY SIGNING BELOW, PURCHASER ACKNOWLEDGES HAVING READ AND AGREED TO ALL SUCH TERMS AND CONDITIONS." In those terms and conditions, all Affected Owners agreed that: "NO PURCHASER SHOULD RELY UPON REPRESENTATIONS OTHER THAN THOSE INCLUDED IN THIS AGREEMENT AND IN THE DOCUMENTS REFERRED TO HEREIN." All Affected Owners further agreed that, "EXCEPT AS OTHERWISE PROVIDED BY LAW, NEITHER CLUB DEVELOPER NOR VI SELLER MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER REGARDING THE ACCOMMODATIONS . . . ." and that he or she would not "rely upon any representations, oral or written, which are not herein set forth [in the Club Agreement]."

      32.    In addition, pursuant to the Purchaser/Member Beneficiary Acknowledgment that the Affected Owners signed and initialed, they acknowledged: (1) that their timeshare interest is

being purchased for their own personal vacation use and enjoyment and not because of any financial or monetary advantage such as rental income, price appreciation or tax advantage; and (2) that "they have not relied upon any statement as to any amount which might be derived from the resale of their timeshare."

33.    In other words, each of the purported misrepresentations referenced in Defendants' letter regarding Affected Owners 3, 4, and 6 have been expressly disclaimed or contradicted by acknowledgements that the Affected Owners signed. Defendants know, or at least should have known, that their clients agreed to these terms and made these acknowledgments, given that Plaintiffs have provided the excerpts from the relevant document to them.

34.    Defendants have shown a propensity in the courts of this state to churn out the same threats and claims either without ever bothering to investigate them. In cases filed by Defendants in the last five years in Florida state courts, the Aaronson Firm and/or its clients have been sanctioned twice for filing lawsuits based on timeshare developers' alleged misrepresentations and omissions supposedly induced owners into purchasing their timeshare interests although directly contradicted by documents the owners signed at closing.[1]  In both cases, the court agreed with the resort defendants that the fraud-based rescission claims brought by the Aaronson Firm were frivolous under Florida Statute § 57.105. One court found:

> [T]he Plaintiffs purported causes of action are based on the same fundamental allegation—that prior to the execution of contract, unidentified sales personnel made certain representations and admitted certain facts.   However, Plaintiffs admitted in their complaint that each and every statement was completely contradicted by the written contract.   Florida courts have held, consistently for decades, that a party cannot recover for fraud or

---

[1] *Johnson v. Bluegreen Vacations Unlimited, Inc.*, No. 2017-CC-1718, 9th Judicial Circuit Court, Orange County (January 24, 2018 Order); *Colvin v. Westgate Vacation Villas, LLC*, No 2016-CC-006539-O, 9th Judicial Circuit Court, Orange County (August 1, 2017 Order).

alleged oral representations that are covered and expressly contradicted in a subsequent written contract.

35.     In another case, a developer filed a motion for attorneys' fees as sanctions that the court has not yet ruled upon.  In that motion, the timeshare developer argues that the lawsuit Defendants filed on behalf of their timeshare-interest owners was frivolous for reasons similar to those upon which courts have previously sanctioned the Aaronson Firm and/or its clients.  The developer in that case alleged:

> [The Aaronson Firm's] attorneys have made a habitual practice of filing hundreds of lawsuits making the same or similar claims against timeshare entities, but they have never done so with any facts to support their claim nor can they develop any set of facts because they do not exist.[2]

36.     The Aaronson Firm, nevertheless, continues to deceptively advertise its rescission methods as the generally applicable means for timeshare owners to avoid their contractual obligations.

**C.     Defendants' website advertising is, by definition, false and misleading.**

37.     The Aaronson Firm distinguishes itself from the typical exit company in its website advertising by touting that it is a law firm.  According to the Aaronson Firm:

> [Y]ou owe it to yourself to hire a licensed attorney who is held *strictly accountable* in every instance by his or her licensing bar. This licensure itself takes typically seven years of higher education, the scrutiny of a rigorous background check, passage of a comprehensive bar examination taking two or three days, and continuing legal education year after year to maintain one's status as a practicing attorney.  So for any attorney to scam someone would be to jeopardize that licensure—to risk losing a status requiring many years of dedication.[3]  (emphasis added).

---

[2] *Wesley A. Gunn and Marsiela Gunn v. Westgate Flamingo Bay, LLC*, No. 2017-CC-004963-O, 9th Judicial Circuit Court, Orange County (July 28, 2017 Motion for Sanctions).
[3] Aaronson Firm website, last accessed March 21, 2018.

38. The Aaronson Firm's primary interface with the public and its potential clients is its website. The statements made on this website, however, run afoul of the standards to which the Aaronson Firm alludes.

39. The Florida Bar regulates advertising on law firm websites. *See* Rule 4-7.11 (a) ("Unless otherwise indicated, this subchapter applies to all forms of communication in any print or electronic form, including but not limited to . . . websites, social networking, and video sharing media."); Rule 4-7.13-4.15. Such advertising is, by definition, deceptive and misleading when it: (1) contains a material statement that is factually or legally inaccurate; (2) omits information necessary to prevent information supplied from being misleading; or (3) implies the existence of a material nonexistent fact. Rule 4-7.13 (a)(1)-(3).

40. The Rules further define "deceptive and misleading" by way of examples of lawyer advertisements that are inherently misleading and deceptive. These examples include:

- statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results;

- references to past results unless objectively verifiable;

- use of a voice or image that creates the erroneous impression that the person speaking or shown is the advertising lawyer or a lawyer or employee of the advertising firm without disclosing that the speaker is "Not an employee or member of the law firm";

- dramatizations of actual or fictitious events unless the dramatization states "DRAMATIZATION. NOT AN ACTUAL EVENT"; and

- dramatizations that reflect an actor purporting to be engaged in legal practice without prominently stating "ACTOR. NOT ACTUAL LAWYER."

41.     The Rules further prohibit *potentially* misleading statements in attorney advertising, which include statements that:   (1) are subject to one or more misleading interpretations; and (2) may be literally accurate, but could reasonably mislead prospective clients regarding a material fact.   Rule 4-7.14 (a)(2).   Finally, attorneys are prohibited from advertising using images, sounds, videos, or dramatizations in a manner designed to solicit legal employment by appealing to prospective clients' emotions.   Rule 4-7.15 (a).

42.     The Aaronson Firm's website is replete with misleading and deceptive statements that are central to Defendants' ploy to lure Plaintiffs' timeshare owners into hiring the Aaronson Firm to assist in their breach of their contractual payment obligations.   Indeed, the website appears designed to convey the four following duplicitous messages:

43.     **First**, the Aaronson Firm is supposedly better than other exit companies because it is a law firm.   **Second**, the Aaronson Firm's lawyers are effective.   **Third**, timeshare developers are evil.   **Fourth**, timeshare developers are violating Florida law, which excuses timeshare owners from their contractual obligations.

> ###     *i.*     *Defendants say the Aaronson Firm is better because it is a law firm.*

44.     The Aaronson Firm's website features a promotional video starring a man dressed in a suit and tie in an office setting.   He advises prospective clients that "timeshare ownership feels like entrapment."   How does he know this?   "Because people tell *us*." (emphasis added). He says:   "They tell *us* about some enticement they were offered. . . ." (emphasis added). According to him:

> At the Aaronson Firm *we've* helped hundreds of clients with their timeshare problems.   Over the years, *we've* developed a refined methodology for addressing these issues.   The chances are good that your timeshare developer is exposed legally in ways that are relatively straightforward and provable.   You owe it to yourself to hire experienced, competent counsel . . . .   And *we are* willing to

sue, if necessary, in the interest of getting you released. So call us
free of charge to discuss your situation. (emphasis added).

45.     By referring to himself and the Aaronson Firm with the first-person-plural
pronoun "we" in an office context, the image "creates the erroneous impression that the person
speaking or shown is the advertising lawyer or a lawyer or employee of the advertising firm."
*See* Rule 4-7.13 (b)(5).  The person appearing in the video does not, however, appear on the
Aaronson Firm's website, and the advertisement does not make the required disclaimer.  *Id.*
("Not an employee or member of law firm.")  On information and belief, this person is not a
lawyer at all, but rather a paid actor.

46.     In the same video advertisement, the Aaronson Firm dramatizes the supposed
typical experience of timeshare owners by using vivid language and imagery designed to play on
timeshare owners' emotions.  *See* Rule 4-7.15 (a).  The purported attorney describes "[h]our after
hour of high pressure sales pitching" leaving prospective timeshare owners "ready to sign almost
anything just to physically escape the room."  The timeshare developer supposedly prevented
prospective purchasers from reading closing documents due to "rapid fire signings of routine
closing documentation [by] rifling through page after page."  Only after closing do the timeshare
owners experience "the shock" that came "when they actually had time to read the sales contract
with all its attachments for the first time at home."  Not to worry, says the supposed lawyer,
"chances are good that your timeshare developer is exposed in ways that are legally
straightforward and provable."  These statements describe what the supposed lawyer, backed by
his years of fictitious experience, claims is the timeshare owners' collective experience with
timeshare developers without disclosing that the video is a dramatization by an actor posing as
an attorney, as required by Florida law.  Rule 4-7.13 (b)(6).  Furthermore, the dramatic
description of what a supposed attorney believes is the common experience of the timeshare

owner encourages potential clients to decide to hire the Aaronson Firm based on emotion and some set of assumed facts, rather than relevant law and actual need. *See* Rule 4-7.15 (a).

47.     Furthermore, the Aaronson Firm claims that:

> As a law firm, we have the ability to sue your timeshare developer if it *has been less than reasonable responding to us in resolving your issues.* The developer knows this, of course, and thus we generally have leverage to negotiate for you on terms more favorable than would otherwise be the case.

(emphasis added).

Additionally,

> [a]n attorney will work with you to discover the problems inherent with your timeshare purchase and bring the necessary legal pressure to bear on the timeshare developer—to the point of litigation if necessary. This is a service that non-attorney staffed timeshare relief companies cannot provide for you. With the power of an attorney behind you as your champion, *you stand a very good chance of actually attaining your goal of timeshare contract rescission.*

(emphasis added).

48.     The Aaronson Firm further encourages timeshare owners to "create leverage."

More specifically:

> We've already told you that you need this. If the developer does not cooperate, it has to know that there are potential consequences. A licensed attorney will have the ability to sue on your behalf. Sometimes it is even a good idea to draft a civil lawsuit, and serve it on the developer, assuring that you will file it if a reasonable response is not forthcoming.

49.     If the developer is not "reasonable," the Aaronson Firm is willing to file a lawsuit to generate leverage, regardless of the merit of such a case. Florida attorneys are, however, prohibited from filing suit exclusively to generate leverage during settlement negotiations. *See* Rule 4-3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein unless there is a basis in law and fact . . . ."). By implying that it is willing to do so, the

Aaronson Firm violates the Florida Rules prohibiting a lawyer from advertising that it can "achieve results by means that violate the Rules of Professional Conduct." *See* Rule 4 7.2 (Communications Concerning a Lawyer's Services).

50.     The Aaronson Firm likewise implies that by simply hiring the Aaronson Firm—regardless of the specifics of the timeshare owners' factual situation—"*you stand a very good chance of actually attaining your goal of timeshare contract rescission.*" (emphasis added) The Aaronson Firm, therefore, violates the Florida Bar's prohibition against "statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results." Rule 4-7.13 (b)(1).

> ii.     *Defendants claim that the Aaronson Firm's lawyers are effective and ethical.*

51.     In order to convince potential clients that the Aaronson Firm and its lawyers are effective and ethical, the Aaronson Firm relies on at least six attorney-scripted client testimonials.

52.     In each instance, the former clients offer prepared testimonials that, on information and belief, they read from cue cards prepared by Aaronson or someone acting on his behalf.   Since the Aaronson Firm did not disclose this, it violates the Rule prohibiting testimonials "written or drafted by lawyers." *See* Rule 4-7.13 (b)(8).

> iii.     *Defendants claim timeshare developers are evil.*

53.     The Aaronson Firm's website reflects the following incendiary statements designed to galvanize timeshare owners to hire the Aaronson Firm.

- **Timeshare developers are "sociopaths."** "A certain kind of personality is required in order to effectively purvey such a product, and we've had occasion to document the extent to which <u>sociopathic</u> tendencies are reflected in the mentality and culture of

timeshare sales. But the fish doesn't rot from the tail up. Personalities spearheading some of the largest developers in the timeshare industry are interesting and colorful studies in alpha-type dominance, replicated in a <u>hierarchical</u> fashion, from the head of the boardroom right down through the rank and file sales reps."

- **Timeshare developers are not empathetic.** "It is important to understand this when engaging in a legal dispute with any timeshare developer. Why? Because a sociopath, by definition, does not empathize with your plight. You cannot go hat in hand to the developer complaining about how essentially unfair it all is. They simply will not respond to you, at least not in any kind of meaningful fashion. Phone calls to numbers given if you have complaints, if they exist at all, are generally not answered. Verifiable, timely communications through email or fax are almost impossible as well. This is by design."

- **Timeshare developers defraud the elderly.** "Though this is purely anecdotal, many older Americans will tell you that there was actually a time in the not-too-distant past, when a person's word was his or her bond. There was less anonymity, less mobility, and shameless lying was simply not tolerated and would invariably, ultimately catch up with the liar. This was the society that produced the greatest generation that won World War II, and its immediate offspring. But this is also the very generation that overwhelmingly buys timeshares, and the tendency to take promises at face value, to take people at their word, and generally trust the people with whom one deals can lead to vulnerability."

54.     Just as inflammatory are Defendants' so-called "case studies." The use of clearly fictitious "case studies" is another example of the Aaronson Firm's attempt to incite controversy between Plaintiffs and their timeshare owners.

55.     In "Case Study-Guy and Veronica," for example, the Aaronson Firm purports to tell the tale of a "lowly stock boy living in Newark" who "had always wanted to vacation in Florida, especially one December when it was oh-so-cold." The Aaronson Firm explains:

> This was truly an adventure, Guy thought. Veronica [his girlfriend] was frightened, though. What if there were snakes, much less alligators. Finally, they arrived at the location, a remote outpost in a camping area that looked like an open-air retreat. Was this the investment property, Guy wondered? It could use some development, but the price would surely be cheap.

56.     Following the developer's presentation:

> Guy was really impressed. Veronica not so much. She thought she noticed a serpent slithering just off the pavement of the veranda. She insisted that Guy take her back to the hotel, right then and there. Guy was crestfallen, but he really liked this girl. Who knows, maybe she'd even let him sleep next to her on the sofa one evening.

57.     When Veronica wanted to leave the presentation to return to her hotel, the developer told her "you won't be going back at all" at which time Veronica started to cry, and Guy threatened to call the police.

58.     The foregoing panders to timeshare interest owners' emotions in order to solicit their business and dramatizes timeshare owners' state of mind without making the required disclosures. *See* Rule 4-7.13 (b)(6) (rule requiring lawyer advertisements that include dramatization to notify the consumer as follows: "DRAMATIZATION. NOT AN ACTUAL EVENT"; Rule 4-7.15(a) (rule against using an image to solicit legal employment by appealing to a prospective client's emotions rather than to a rational evaluation of the lawyer's suitability).

   *iv.*  **Defendants imply that developer misconduct excuses timeshare owners**
       **from contractual obligations.**

59. Without context or explanation, the Aaronson Firm uses confusing legal jargon to sell its services.

- **Fiduciary Duties**—According to Defendants, the management company to which owners pay their maintenance fees owe fiduciary duties to timeshare owners. Defendants then conclude that timeshare developers must have breached that duty: "the developer owes [the timeshare owner] a <u>fiduciary</u> duty to properly manage and account for [maintenance] funds. And as you can see . . . the chances are good that this is not happening." Because Defendants proffer no legal or factual basis supporting this conclusion it misleads potential clients into believing that the mere existence of a duty (should one exist) is evidence of its breach. *See* Rule 4-7.13 (a)(1)-(2).

- **Diversion of Maintenance Funds**—Defendants say that timeshare developers betray confidences they purportedly owe owners by appointing members to the homeowners association that manages the timeshare owners' maintenance payments. A timeshare developer's ability to appoint board members is insufficient to support Defendants' inference that "timeshare developers are often diverting these funds to general operating revenues." *See* Rule 4-7.13 (a)(1)-(2).

- **Maintenance Fees are Trust Funds**—Defendants claim that Maintenance Fees are "trust funds" but neither explain the factual basis nor legal significance of this claim. By omitting any explanation, Defendants' conclusion is misleading under the Rules. *See* Rule 4-7.14 (a)(2) (rule against literally accurate but misleading statements); Rule 4-7.13 (a)(1) (rule against material statements that are factually or legally inaccurate);

Rule 4-7.13 (a)(2) (rule against omissions of information necessary to prevent the information being supplied from being misleading).

- **Rescission is a Generally Available Remedy**—Defendants say: "If you are disappointed with your . . . timeshare, please don't hesitate to call us concerning your legal options, including rescission of the contract . . . ." Integral to the Aaronson Firm's rescission strategy is a "Rescission Predicate Correspondence." According to Aaronson, "[n]ext a civil complaint will be drafted and the Timeshare Developer will be notified of our intent to file a lawsuit." Thus, "[w]ith the power of an attorney behind you as your champion, you stand a very good chance of actually attaining your goal of timeshare contract rescission." Defendants fail to explain that rescission is available in instances of actual fraud or during a 10-day window prescribed by statute. *See* FLA. STAT. § 721.10(1). Defendants' statements regarding rescission are inherently misleading because they omit key information necessary to correct the misimpression that rescission is a generally available remedy, which it is not. *See* Rule 4-7.13 (a)(2).

60.     Defendants' website was intended to mislead and, in fact, misled timeshare owners into reaching the following conclusions:   (1) Defendants are superior to other exit companies simply because they are a law firm and licensed attorney; (2) the Aaronson Firm's attorneys are competent, experienced, and ethical; (3) timeshare developers are sociopaths whose business model depends on bilking the elderly; and (4) Defendants will increase owners' chances of avoiding their timeshare obligations, regardless of the facts of any given case.

61.     As a result of Defendants' deceptive marketing campaign, the Affected Owners hired Defendants to help them avoid paying Plaintiffs. Instead, Defendants caused a rift between

Plaintiffs and the Affected Owners and, on information and belief, encouraged them to divert their loan and/or Maintenance Fees payments to Defendants.

62.     All conditions precedent to bringing this action have been excused, satisfied, or waived.

## COUNT I
### Tortious Interference with Existing Contractual Relationships

63.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

64.     Club Exploria entered into the valid and enforceable Club Purchase Agreement pursuant to which Plaintiffs sold timeshare interests in certain Club Exploria-owned resorts to the Affected Owners.  Under the Club Purchase Agreement, the Affected Owners agreed to make Maintenance Fees payments to CEM pursuant to the terms of the governing Public Offering Statement, owners' association bylaws, and the Trust Declaration.  The Trust Declaration is incorporated into the terms of the Club Purchase Agreement and allows CEM a claim against any Affected Owner that does not make Maintenance Fees payments as required.

65.     Summer Bay Partnership financed Affected Owner 1's, Affected Owner 3's, Affected Owner 5's, and Affected Owner 6's purchases of their timeshare interests pursuant to the terms of the promissory notes under which the they agreed to make monthly principal and interest payments toward the amount Summer Bay Partnership loaned to these Affected Owners. Club Exploria is the assignee of all Summer Bay Partnership's interest in, to, and under the promissory notes issued by Affected Owner 1, Affected Owner 3, Affected Owner 5, and Affected Owner 6 and the related mortgages and all documents executed and delivered in connection with such notes and mortgages, including all consumer loan documents and files, all

monies due and to be come due on account of such mortgages, and all rights accrued or to accrue under such mortgages and other documents.

66.     Defendants had actual knowledge of the Affected Owners' contractual obligations owed to Plaintiffs but nonetheless intentionally procured their breach of the same.  Defendants' deceptive and misleading website advertising campaign was designed to solicit potential clients, including the Affected Owners, to cancel their timeshare contracts based on their status as timeshare-interest owners.   Once the Affected Owners hired Defendants, Defendants sent correspondence to Club Exploria and Summer Bay Partnership acknowledging the contractual obligations the Affected Owners owed them and purported to relieve them of the same by attempting to cancel the Affected Owners' purchase of their respective timeshare interests.  In the weeks before or after Plaintiffs' first receipt of correspondence from Defendants on behalf of the Affected Owners, the Affected Owners 1, 2, 3, and 5 stopped making loan and/or Maintenance Fees and dues payments that were due to Plaintiffs due under the Club Purchase Agreement and/or the promissory notes.

67.     Defendants' procurement of Affected Owners 1, 2, 3, and 5's breaches of their contractual obligations to Plaintiffs is without privilege or justification because it was not based on Defendants' honest, good faith legal advice.   Instead, upon information and belief, Defendants have advised the Affected Owners stop making the payments owed to Plaintiffs based on timeshare rescission theories that Defendants actually knew or, at the very least, should have known are undermined by documents the Affected Owners signed in connection with their purchase.  As such, Defendants' procurement of the Affected Owners 1, 2, 3, and 5's breach is exclusively for Defendants' pecuniary gain.

68.     As a result of these Affected Owners' breaches, which were intentionally and wrongfully procured by Defendants, Club Exploria lost the stream of principal and interest payments owed by Affected Owner 1, Affected Owner 3, and Affected Owner 5.  CEM lost the Maintenance Fees owed by Affected Owners 2, Affected Owner 3, and Affected Owner 5.

69.     Because Defendants acted with gross indifference and reckless disregard of Plaintiffs' rights when they interfered with Plaintiffs' contractual relationships with the Affected Owners, they acted wantonly and willfully.  As such, Plaintiffs request that the Court award Plaintiffs punitive damages.

## COUNT II
## Civil Liability for Violations of the Racketeer Influenced and Corrupt Organizations ("RICO Act") Act (18 U.S.C. § 1962 (b)-(c))

70.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

71.     Defendants have violated the RICO Act by maintaining, conducting, and participating in an enterprise that, through a pattern of racketeering activity engaged interstate commerce, caused financial injury to Plaintiffs' business.  *See* 18 U.S.C. § 1962 (b)-(c).

72.     The Aaronson Firm, which was founded and is controlled by Aaronson, is a business enterprise that engages in interstate commerce through its interactive website that invites potential clients nationwide to communicate with Defendants through email and live chat.

73.     Plaintiffs have identified at least six instances in which the Defendants have committed mail and wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, by intentionally participating in a scheme to defraud Plaintiffs of money they are owed by the Affected Owners and using the mail and wires in furtherance of that scheme.  *See supra* at ¶¶ 18-24.

74.     In fact, the wires and mail are central to Defendants' scheme to defraud.  Since 2013, Defendants have maintained a website that, through a litany of inherently misleading and deceptive statements, convinces potential clients that:  (1) timeshare developers are sociopaths bent on bilking the elderly; (2) Defendants will increase the timeshare owners' chances of avoiding their timeshare obligations, regardless of the facts of any given situation; (3) the Aaronson Firm is better than other exit companies because it is a law firm; and (4) the Aaronson Firm's attorneys are competent, experienced, and ethical.  *See supra* ¶¶ 37-60.

75.     The purpose of these statements, which are directed to timeshare interest owners including the Affected Owners, is to convince potential clients to divert the payments they are contractually obligated to make to timeshare developers, lenders, and management companies such as Plaintiffs to Defendants.  Since the Aaronson Firm and Aaronson are a law firm and licensed attorney and (among other issues) employed confusing legal jargon in internet advertising, a person of ordinary prudence would have been deceived by Defendants' deceptive and misleading messages.  *See supra* ¶¶ 59-61.

76.     Relying on the foregoing statements, the Affected Owners hired Defendants to help them avoid their contractual payment obligations owed to Plaintiffs.  Upon information and belief, Defendants misleading statements convinced Affected Owners 1, 2, 3, and 5 to use the funds contractually allocated to Plaintiffs in order to pay Defendants' attorneys' fees.

77.     Defendants sent Club Exploria and Summer Bay Partnership nine letters regarding the six Affected Owners.  In light of August 1, 2017 and January 25, 2018 sanctions orders entered against the Aaronson Firm and the July 28, 2017 sanctions motion filed against Aaronson, Defendants must know that the theories upon which they base their rescission demands are frivolous.  In light of Club Exploria's February 14, 2018 correspondence to

Defendants, Defendants are actually aware that Defendants' demands for rescission are factually and legally baseless. As such, Defendants' letters to Club Exploria and Summer Bay Partnership are evidence that the Affected Owners are being defrauded by Defendants into diverting money allocated for payment to Plaintiffs to Defendants.

78.     The misleading and deceptive statements that Defendants make on the Aaronson Firm's website and the fraud perpetrated on the Affected Owners and Plaintiffs are related. Defendants' website is the online vehicle by which Defendants tricked the Affected Owners into hiring the Defendants and paying Defendants money allocated to satisfy the Affected Owners' payment obligations to Plaintiffs. The diverted payments are in exchange for the shoddy advice Defendants provide. The foregoing letters to Plaintiffs provide the appearance that Defendants are providing legitimate legal services, which is essential to Defendants' scheme to defraud. Additionally, Defendants' fraudulent conduct is of a continuing nature—each of the deceptive and misleading statements identified above appear on the Aaronson Firm's website as of the date of this filing, and on March 19, 2018, March 28, 2018, and April 9, 2018, Plaintiffs received Defendants' latest rescission or fraud correspondence related to Affected Owners 4 and 6, who have not yet defaulted on note payments to Club Exploria and/or Maintenance Payments owed to CEM.

79.     As a direct and proximate result of Defendants' foregoing conduct, Club Exploria lost the stream of payments it is owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and CEM lost the Maintenance Fees it is owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5.

80.     Plaintiffs have incurred and will continue to incur attorneys' fees in connection with prosecuting this action under the RICO Act. Plaintiffs request that the Court award

Plaintiffs such fees, threefold damages, and costs as provided under 18 U.S.C. § 1964(c) as well as punitive damages.

## COUNT III
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### (FLA. STAT. §§ 501.204, 501.211)

81.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

82.     Defendants engaged in unfair and deceptive practice in trade or commerce by maintaining a website that, through a litany of inherently misleading and deceptive statements, was designed to convince potential clients that: (1) timeshare developers are sociopaths bent on bilking the elderly; (2) the Aaronson Firm will increase the owners' chances of avoiding their timeshare obligations, regardless of the facts of any given situation; (3) the Aaronson Firm is superior to other exit companies because it is a law firm; and (4) the Aaronson Firm's attorneys are competent, experienced, and ethical. *See supra* at ¶¶ 41-60.    Based on the foregoing messages, the Affected Owners hired Defendants to improperly try to cancel their purchase of a timeshare interest in a Club Exploria-owned resort, which was intended for personal use only, based on legal theories that have been rejected and factual bases that Defendants knew, or at least should have known, were contradicted by documents the Affected Owners signed. Defendants' deceptive conduct not only harmed the consumer—the Affected Owners—it caused actual harm to Plaintiffs.

83.     As a direct and proximate result of Defendants' foregoing conduct, Club Exploria lost the stream of payments it is owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and CEM lost the Maintenance Fees it is owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5.

84.     Plaintiffs have incurred and will continue to incur attorneys' fees and costs in connection with prosecuting this action under FDUTPA.  Plaintiffs request that the Court award Plaintiffs such fees and costs pursuant to Florida Statute § 501.2105(1).

**COUNT IV**
**False or Misleading Advertising Under the Lanham Act (15 U.S.C. § 1125(a))**

85.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

86.     Defendants engaged in false or misleading advertising by maintaining a public, interactive website that reaches timeshare owners throughout the United States, including those located in Washington and Virginia.  Through misleading and deceptive statements that appear on that website, Defendants influence potential clients to hire them to provide timeshare-relief services because:  (1) the Aaronson Firm will increase the owners' chances of avoiding their timeshare obligations, regardless of the facts of any given situation; (2) timeshare developers are sociopaths bent on bilking the elderly; (3) the Aaronson Firm is superior to other Exit Companies because it is a law firm; and (4) the Aaronson Firm's attorneys are competent, experienced, and ethical. *See supra* at ¶¶ 41-60.  Because Aaronson and the Aaronson Firm are an attorney and law firm, respectively, the statements made on the Aaronson Firm's website—particularly those including legal jargon—have the capacity to deceive consumers such as the Affected Owners. Upon information and belief, Defendants' misleading statements did, in fact, mislead the Affected Owners and had a material effect on their decision to hire Defendants to help them avoid their contractual obligations to Plaintiffs.  Defendants' foregoing deceptive conduct not only harmed the consumer—the Affected Owners—it caused actual harm to Plaintiffs.

87.     Plaintiffs' harmed interests are "within the zone of interests protected" by the Lanham Act.  As a result of Defendants' deceptive advertising campaign, which disparaged

timeshare developers such as Club Exploria as sociopaths, Club Exploria lost the stream of payments they are owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and CEM lost the Maintenance Fees it is owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5.  Additionally, Club Exploria is likely to lose the Maintenance Fees it is owed by Affected Owner 4 and Affected Owner 6.

88.     Plaintiffs also seek damages in the amount of Defendants' profits gained as a result of the foregoing misconduct, their costs incurred prosecuting this action, as well as exemplary damages to the maximum extent allowable under 15 U.S.C. § 1117(a).  Plaintiffs have incurred and will continue to incur attorneys' fees and costs in connection with prosecuting this action under the Lanham Act.  Plaintiffs request that the Court award Plaintiffs such fees and costs pursuant to 15 U.S.C. § 1117 (a).

## COUNT V
## Misleading Advertising Under Florida Statue § 817.41

89.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

90.     Plaintiffs and Defendants are competitors in the sense that Defendants' business depends on Defendants convincing Plaintiffs' timeshare owners to divert the money they owe Plaintiffs to pay Defendants for supposed timeshare-relief services.  In this sense, Plaintiffs and Defendants are involved in a zero-sum game—each of Plaintiffs' timeshare owners that Defendants gain as a customer is a timeshare owner that Plaintiffs lose as a customer.

91.     While in competition with Plaintiffs, Defendants made the following misrepresentations of material fact, among others, through their website: (1) timeshare developers are sociopaths; (2) timeshare developers are incapable of empathy; (3) time share developers defraud the elderly; (4) "[t]he chances are good that your timeshare developer is

exposed legally in ways that are relatively straightforward and provable"; (5) the paid actor that appears in the video advertisement on Defendants' website is a lawyer; (6) "[w]ith the power of an attorney behind you as your champion, [timeshare owners] stand a very good chance of actually attaining [the timeshare owners' goal] of timeshare contract rescission"; (7) Defendants' website reflects genuine, unscripted video testimonials of actual satisfied clients of Defendants; and (9) presenting dramatizations as actual "case studies." *See supra* at ¶¶ 37-60.

92.     Defendants knew or should have known that the foregoing statements were false because, upon information and belief, Defendants control the content of the Aaronson Firm's website and were duty bound, as a law firm, to ensure that statements on their website were accurate. Furthermore, the information that would establish the falsity of these statements was in the Defendants' possession.

93.     Defendants' website is for advertising purposes and, as such, the misrepresentations that appear on the website are intended to induce timeshare owners, including the Affected Owners, to rely on them in deciding to hire Defendants to provide timeshare relief services and to cease honoring their obligations to Plaintiffs.

94.     As a result of Defendants' deceptive advertising campaign, which includes disparaging timeshare developers such as Club Exploria as sociopaths, Club Exploria lost the stream of payments they are owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and CEM lost the Maintenance Fees it is owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5. In light of the foregoing, Plaintiffs request that they be awarded punitive damages pursuant to § 817.41(6).

95.     Plaintiffs have incurred and will continue to incur attorneys' fees and costs in connection with prosecuting this action under § 817.41(1) of the Florida Statutes. Plaintiffs

request that the Court award Plaintiffs such fees and costs pursuant to § 817.41(6) of the Florida Statutes.

**COUNT VI**
**Trade Libel**

96.     Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

97.     Through their website, Defendants publish false factual statements regarding timeshare developers like Club Exploria, including that timeshare developers are sociopaths, are incapable of empathy, shamelessly lie to the elderly in order to convince them to purchase timeshare interests, breach fiduciary duties owed to timeshare owners, and divert Maintenance Fees paid by timeshare owners. *See supra* at ¶¶ 53-59.

98.     Defendant Aaronson is only licensed in Florida and, based on a search of publicly available court documents involving Defendants, Defendants provide their timeshare relief services in Florida.   The group of timeshare developers to which Defendants' defamatory statements were directed is small enough for the defamation to be reasonably understood to refer to Club Exploria.

99.     When Defendants made the false and disparaging statements regarding timeshare developers, Defendants knew that these statements would likely result in inducing the Affected Owners and others not to deal with Club Exploria.  The manifest purpose of Defendants' website is to encourage timeshare interest owners like the Affected Owners to use money allocated to satisfy their obligations under agreements with Plaintiffs to hire Defendants to provide supposed timeshare relief services.   On information and belief, the foregoing falsehoods published by Defendants in fact played a material and substantial role in Affected Owners 1, 2, 3, and 5's

decisions to hire Defendants, stop making the payments due to plaintiffs, and to stop dealing with Plaintiffs altogether.

100.    As a result of Defendants' false and disparaging statements regarding resort developers, Club Exploria lost the stream of payments they are owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and CEM lost the Maintenance Fees it is owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5.   Additionally, Defendants' defamatory statements have harmed Plaintiffs' business reputation and goodwill in the community.   As a result, current and prospective timeshare interest owners are discouraged from doing or continuing to do business with Plaintiffs.

101.    Because Defendants made the foregoing libelous statements with gross indifference and reckless disregard of Plaintiffs' rights, Defendants' acted wantonly and willfully.   As such, Plaintiffs request that the Court award Plaintiffs punitive damages.

## V.    PRAYER FOR DECLARATORY RELIEF
### (FED. R. CIV. P. 57, 28 U.S.C. §§ 2201, 2202)

102.    Plaintiffs restate and reallege the allegations contained in the preceding paragraphs 1 through 62 and incorporate the same by reference as if fully set forth herein.

103.    Club Exploria received correspondence from Defendants on behalf of Affected Owners 1, 2, and 3.   In that correspondence, Defendants sought to unilaterally rescind Affected Owners 1, 2, and 3's purchase of timeshare interests in Club Exploria resorts because those owners allegedly had not yet received one or more of the following documents in the form required pursuant to the Florida Vacation and Timeshare Act:   (1) a fully executed paper copy of the purchase contract; (2) the Public Offering Statement and required exhibits; (3) a receipt for documents received indicating an documents not included; (4) an executed copy of any

document the purchaser signs; and/or (5) the conveyance of the timeshare estate title to purchaser or clerk of court.

104.    According to Defendants, because Affected Owners 1, 2, and 3 have not yet received the foregoing documents, the 10-day cancellation period prescribed under § 721.10 (1)(a)-(b) of the Florida Statutes has not yet begun to run. Affected Owners 1, 2, and 3 signed, at or near the time of closing on their timeshare interests, the Receipt for Timeshare Documents acknowledging their receipt of each of the foregoing documents and the Club Exploria Alternate Media Disclosure Statement that comports with Rule 61B-17.011 of the Florida Administrative Code. Plaintiffs, therefore, contend that the 10-day cancellation period under § 721.10 for Affected Owners 1, 2, and 3 began to run at that time. Plaintiffs informed Defendants of this contention through the attached correspondence.

105.    Plaintiffs and Defendants are, therefore, involved in dispute over the date on which the 10-day rescission period under § 721.10 (1)(a)-(b) began to run. In order to resolve this controversy and to provide clarity regarding this issue, Plaintiffs request that the court declare that: (1) by signing the Receipt for Timeshare Documents, Affected Owners 1, 2, and 3 admitted receiving all the documentation Defendants claim that they did not receive in correspondence to Club Exploria; (2) the standard Club Exploria Alternate Media Disclosure Statement meets the requirements Rule 61B-17.011 of the Florida Administrative Code; (3) by signing the Alternative Media Disclosure Statement, Affected Owners 1, 2, and 3 agreed to receive and acknowledge receipt of the documentation that they claim, through Defendants, they did not receive; and (4) the time period during which Affected Owners 1, 2, and 3 could cancel their timeshare interest purchase pursuant to § 721.10(1)(a)-(b) began to run on the dates on

which Affected Owner 1, 2, and 3 signed the Club Exploria Receipt for Timeshare Documents, or otherwise, the date on which they actually received these documents.

106.   Additionally, via correspondence sent to Club Exploria, Defendants claim that Affected Owners 3 and 4 decided to purchase their timeshare interests from Summer Bay Partnership based on the following allegedly false statements and coercive conduct: (1) there are no Maintenance Fees associated with Affected Owners 3 and 4's purchase of their timeshare interests; (2) Exploria points could be cashed in for money; (3) Affected Owners 3 and 4's interests could be rented to third parties; (4) timeshare interests are profitable; (5) Summer Bay Partnership deprived Affected Owners 3 and 4 of their opportunity to review documents before purchasing their timeshare interests; (6) Affected Owners 3 and 4's timeshare interests would appreciate in value similar to real-estate investments; (7) Affected Owners 3 and 4 could make reservations at any resort without limitation; and (8) there are tax benefits associated with Affected Owner 3 and 4's purchase of their timeshare interests.   Based on the foregoing, Defendants seek a rescission of Affected Owners 3 and 4's timeshare interest.

107.   Similarly, via correspondence from Defendants to Summer Bay Partnership on Affected Owner 6's behalf, Defendants claim that Summer Bay Partnership engaged in the following false statements or coercive conduct: (1) Affected Owner 6's timeshare interests would appreciate in value similar to real-estate investments; (2) Affected Owner 6 could make reservations at any resort without limitation; (3) the maintenance fees associated with Affected Owner 6's timeshare interest would remain fixed; and (4) Summer Bay Partnership deprived Affected Owner 6 of his opportunity to review documents before purchasing their timeshare interests.

108. However, Affected Owners 3, 4, and 6 signed documents in connection with purchasing their timeshare interests in which they deny that Club Exploria made the statements that Affected Owner 3, 4, and 6 allege in their correspondence to Club Exploria. Affected Owners 3, 4, and 6 agreed that "BY SIGNING BELOW, PURCHASER ACKNOWLEDGES HAVING READ AND AGREED TO ALL SUCH TERMS AND CONDITIONS." In those terms and conditions, Affected Owners 3, 4, and 6 agreed that: "NO PURCHASER SHOULD RELY UPON REPRESENTATIONS OTHER THAN THOSE INCLUDED IN THIS AGREEMENT AND IN THE DOCUMENTS REFERRED TO HEREIN." Affected Owners 3, 4, and 6 further agreed that, "EXCEPT AS OTHERWISE PROVIDED BY LAW, NEITHER CLUB DEVELOPER NOR VI SELLER MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER REGARDING THE ACCOMMODATIONS . . . ." and that he or she would not "rely upon any representations, oral or written, which are not herein set forth [in the Club Agreement]." Affected Owners 3, 4, and 6 further agreed under the terms of the Club Purchase Agreement, that the amount of Maintenance Fees are subject to change. Under the Club Agreement and the Club Bylaws, and related Purchaser/Member Beneficiary Acknowledgement signed by Affected Owners 3, 4, and 6 the Affected Owners agreed: (1) to pay common assessment fees, which included Maintenance Fees; (2) Exploria points have no monetary value; (3) that they are not purchasing their timeshare interests because of any financial benefit such as rental income, price appreciation, or tax advantages; and (4) reservations at the property are made on a first-come-first-served, price-available basis.

109. Plaintiffs and Defendants are involved in a dispute over whether the foregoing statements allegedly made by Club Exploria and Summer Bay Partnership in connection with Affected Owners 3, 4, and 6's purchase of their timeshare interests are grounds for cancelling

their purchases in light of the foregoing provisions in the Club Agreement, Terms and Conditions, Club Bylaws, and the related Purchaser/Member Beneficiary Acknowledgement signed by Affected Owners 3, 4, and 6 when they purchased their timeshare interests.

110.   In order to resolve this controversy and to provide clarity regarding this issue, Plaintiffs request that the court declare that Affected Owners 3, 4, and 6 disclaimed reliance and/or acknowledged that they were not relying on any of the foregoing alleged statements when deciding to purchase their timeshare interests.

## VI.   PRAYER

WHEREFORE, Plaintiffs request that the Court:

i.   award Plaintiffs their actual damages, including but not limited to (1) Club Exploria's lost the stream of payments it is owed under Affected Owner 1, Affected Owner 3, and Affected Owner 5's notes and (2) CEM's lost Maintenance Fees owed by Affected Owner 2, Affected Owner 3, and Affected Owner 5;

ii.   award Plaintiffs treble damages under the RICO Act;

iii.   award Plaintiffs their attorneys' fees and costs under the FDUTPA, the Lanham Act, and the RICO Act;

iv.   declare that: (1) by signing the Receipt for Timeshare Documents, Affected Owners 1, 2, and 3 admitted receiving all the documentation Defendants claim that they did not receive in correspondence Plaintiffs; (2) the standard Club Exploria Alternate Media Disclosure Statement meets the requirements Rule 61B-17.011 of the Florida Administrative Code; (3) by signing the Alternative Media Disclosure Statement, Affected Owners 1, 2, and 3 agreed to receive and acknowledge receipt of the documentation that they claim, through Defendants, they did not receive; and (4) the time period during which Affected Owners 1, 2, and 3 could cancel their timeshare interest purchase pursuant to § 721.10(1)(a)-(b) began to run on the dates on which Affected Owner 1, 2, and 3 signed the Club Exploria Receipt for Timeshare Documents.

v.   declare that Affected Owners 3, 4, and 6 disclaimed reliance and/or acknowledged that they were not relying on any of the foregoing alleged statements when deciding to purchase their timeshare interests;

    vi.        award Plaintiffs all special damages to which they are justly entitled, including but not limited to, punitive damages; and

    vii.       award such other and further relief, both at law and in equity, to which Plaintiffs may be justly be entitled.

Respectfully submitted,

By: */s/ David Cannella*
     David Cannella
     Florida State Bar No. 983837
     david.cannella@hklaw.com

**HOLLAND & KNIGHT LLP**
200 South Orange Avenue, Suite 2600
Orlando, Florida 32801
Telephone: (407) 244-5207
Telecopier: (407) 244-5288

By: */s/ William J. Moore*
     William J. Moore
     Texas State Bar No. 24051075
     william.moore@kattenlaw.com
     Michael J. Chiusano
     Texas State Bar No. 24069503
     michael.chiusano@kattenlaw.com

**KATTEN MUCHIN ROSENMAN LLP**
1717 Main Street
Suite 3700
Dallas, Texas 75201
Telephone: (214) 765-3600
Telecopier: (214) 765-3602

**ATTORNEYS FOR PLAINTIFFS**