UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CLUB EXPLORIA, LLC and CLUB
EXPLORIA MANAGEMENT, LLC,

                    Plaintiffs,

v.                                                      Case No:  6:18-cv-576-Orl-28DCI

AARONSON, AUSTIN, P.A. and
AUSTIN N. AARONSON,

                    Defendants.
_____

## ORDER

Plaintiffs Club Exploria, LLC (Club Exploria) and Club Exploria Management, LLC (CEM) (collectively Exploria) brought this action against Defendants Aaronson, Austin, P.A. and Austin N. Aaronson (Austin) (collectively Aaronson) asserting claims arising from statements made on Aaronson's websites and Aaronson's representation of six specific Club Exploria timeshare owners. Exploria's claims include tortious interference (Count I), violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count III), false advertising in violation of the Lanham Act (Count IV), and trade libel (Count V).  (Am. Compl., Doc. 39). [1]   The Court previously dismissed Exploria's RICO claim (Count II) with prejudice.  (Order, Doc. 87).  Aaronson now moves for summary judgment on all remaining claims, (Mot., Doc. 126), and Exploria moves for summary judgment on Counts I, III, and

_____

[1] The claims in the Amended Complaint (Doc. 39) include repeated references to the Rules Regulating The Florida Bar.  This Court is not the proper forum for Bar grievances; it is concerned with laws that the alleged acts at issue may violate.

IV, (Mot., Doc. 129).[2]  As set forth below, Aaronson's motion is granted and Exploria's motion is denied.

## I.      Background

Club Exploria sells timeshare interests (a/k/a "vacation interests").  The timeshare interests come in the form of club ownership or a resort stay during a designated week. (Baker Dep., Doc. 126-3, at 33).[3]  While club ownership involves points that may be used throughout the year to stay at various resorts within Exploria's network, (id.; Smith Dep., Doc. 126-18, at 12, 31), an interest in a designated week entitles a purchaser to occupy a specific resort unit for a specified week, (Doc. 126-3 at 33).  Owners may finance these purchases through an Exploria affiliate.  (Doc. 126-18 at 63–64).

CEM manages homeowners' associations at Club Exploria's resorts.  (Lizotte Dep., Doc. 126-20, at 17).  Owner-controlled homeowners' association boards set budgets for each resort.  (Id. at 18).  Based on the budgets, all owners are required to pay annual maintenance fees in addition to any loan payments that they may owe.  (Doc. 126-18 at 44–45).

Austin is no stranger to Exploria because he owns and operates a law firm— Defendant Aaronson, Austin, P.A.—specializing in timeshare owner grievances against developers.  (Austin Dep., Doc. 126-22, at 32).  Disgruntled owners sometimes find the firm through attorney referral services, (id. at 66), but they also find the firm through its websites, which contain colorful statements and media aimed at optimizing internet

---

[2] Exploria filed a Response (Doc. 158) to Aaronson's motion and Aaronson filed a Reply (Doc. 163).  Aaronson filed a Response (Doc. 157) to Exploria's motion and Exploria filed a Reply (Doc. 164).

[3] Deposition citations are to deposition page numbers, not electronic file page numbers.

visibility, (id. at 65–66, 92). Even if new clients do not locate the firm through the websites, they are emailed a link to one of the sites when their retainer agreement is sent to them. (Id. at 76).

Exploria asserts that Aaronson uses false and misleading website advertisements to convince timeshare owners that they can easily cancel their timeshare contracts if they hire Aaronson. According to Exploria, Aaronson then advises owners to stop paying their loan and fee obligations, causing damages to Exploria in the form of lost principal, interest, and maintenance fee payments.

A.      The Website Statements

Defendants spend approximately $100,000 per year on website development and maintenance, (id. at 95–96), and another $100,000 per year on Google search optimization, (id. at 103–04). The Aaronson websites contain testimonials, blog posts, a book, and videos designed to attract dissatisfied timeshare owners. For example, the following statement appeared on one of the sites:

> Timeshare ownership often feels like entrapment. At the Aaronson Law Firm, we know this because we hear our Clients' stories.
>
> . . . .
>
> But chances are good that your timeshare developer is exposed legally in ways that are relatively straightforward and provable. You owe it to yourself to hire experienced, competent counsel. At the Aaronson Firm, we have over 80 years of combined legal experience. And we are willing to sue, if necessary, in the interest of getting your timeshare cancelled.
>
> So please contact us using one of our three convenient methods to receive a free consultation to discuss your situation. You can:
>
> 1. Call us free of charge,
>
> 2. Use our Contact Form above, or
>
> 3. Live Chat with a person ready to assist you.

YOUR LEGAL PROBLEMS ARE NOT INSURMOUNTABLE!

> If you need to cancel your timeshare, the timeshare Attorneys of the Aaronson Law Firm stand ready and able to help you!

(Doc. 132-8 at 2).  The sites also contained an explanation of the process that the firm uses to help clients "cancel" their timeshare contracts:

> The Aaronson Law Firm consists of a number of Attorneys and Support Staff who are solely dedicated to helping you cancel your timeshare contract.  It is all we do.  That fact allows us to be focused on your direct timeshare cancellation needs, giving you the best chance to have your timeshare successfully rescinded.
>
> How do we do this?
>
> Initial Consultation: In our initial, free consultation with you, we discuss the details of your situation so that we can make sure that we have a full and accurate understanding of your case.  We ask you questions that help us evaluate your case and ascertain how best we are able to help you while formulating the best course of action to move forwards toward a successful rescission.
>
> . . . .
>
> Rescission Predicate Correspondence (RPC):  This is a formal legal demand letter that is created, initiating the rescission process.  The "carrot" dangled therein often involves transfer of the timeshare back to the developer with no money changing hands, in spite of funds already spent by the client.
>
> Civil Complaint:   The civil complaint is drafted, attached to the RPC, referenced therein, and published to the Timeshare Developer with a view toward filing in a court of competent jurisdiction.  This is the proverbial "stick" exposing the developer to potential liability.

(Doc. 132-9 at 2).  Additionally, Aaronson used the site to direct viewers to its blog and stated:

> Quite often, one's signature on a timeshare contract is obtained by fraud. And the debt that it creates generally outweighs any benefit to the owner.  But to address it properly, it is imperative that you retain a licensed attorney.
>
> You can complain ad nauseam about the pack of lies that you were told during the high pressure sales pitch, how the 'hour-long' presentation became four or five hours, about how they wore you down emotionally, and

about the rapid-fire signings of 'routine' closing documentation presented, as the salesman rifled through page after page.

And you can go on and on about the rude awakening when the first bill came in the mail, and the shock you felt when you finally had the chance to actually read the sales contract at home. And then there was the awful frustration of actually trying to book their [sic] vacation, only to be told that you didn't have enough 'points' or some other excuse.

But going over this disturbing series of events is not likely to carry much weight legally. After all, it's your word against there's [sic], and that contract you signed is chock full of waivers and disclaimers to protect the developer.

But experienced, competent counsel will know how to exploit other points of vulnerability. For example, the developer may well be perpetrating an ongoing conflict of interest. Improper handling of trust funds are [sic] also a major issue.

This is where the developer is most vulnerable. This is where your leverage is. And by far the best way to leverage this is through a licensed attorney who will have subpoena power over books and records.

(Doc. 131-8 at 2).

The Aaronson websites contained videos purporting to be testimonials of Aaronson's clients. On one website, professional actors posed as Aaronson lawyers and dissatisfied timeshare owners. (Doc. 126-22 at 127, 129). On another, Aaronson employees played the same roles. (Id. at 129). In both instances, the role players read statements of actual unhappy timeshare owners. (Id. at 127). One of the websites also included two printed testimonials that were written by the web designer and an Aaronson employee but attributed to timeshare owners. (Id. at 93–94). The websites mention some timeshare developers by name, but Exploria is not among them. The focus of the criticism is the timeshare industry in general.

## B.   The Affected Owners

Aaronson has represented at least 22 Club Exploria owners attempting to cancel their timeshare contracts. (Doc. 131-6 at 6–7). But Exploria's Amended Complaint (Doc.

39) seeks damages for lost loan and fee payments for six specific Club Exploria owners (Affected Owners).   The Amended Complaint does not identify the Affected Owners by name, but Exploria's responses to Aaronson's interrogatories provide names and details for each of the six Affected Owners.   Oddly, Exploria's motion for summary judgment lists different owners as the Affected Owners.   The Court disregards the new list because Exploria has not requested leave to amend its complaint or interrogatory answers.

Affected Owner 1 upgraded his vacation interest to access superior resort properties several times over the course of a decade and thus is familiar with the timeshare sales process and fee payment requirements.   (D'Agostino Dep., Doc. 126-15, at 24, 25, 26, 28, 31, 36, 53–54).   But he eventually became dissatisfied with the process and his purchases. (Id. at 15, 36, 46, 57, 58, 64).   He sent a letter to Exploria asking for help, but no one responded. (Id. at 86–87).   He tried to contact sales personnel while he was on property for vacations, but the personnel he sought were never available.   (Id. at 45–46, 49).   He also tried to call sales personnel, but they never returned his calls.   (Id. at 58).   On November 26, 2017, he sent a letter to Exploria attempting to cancel his contract.   (Doc. 126-16).

Affected Owner 1 then retained Aaronson in December 2017 and ceased making payments in March 2018.   (Doc. 126-36 at 6; Doc. 126-17 at 2).   No one from the law firm told him to stop making loan or maintenance fee payments, (Doc. 126-15 at 84); he stopped paying because Exploria quit sending him bills and he did not see a reason to pay maintenance fees for properties he could not use because of his delinquency, (id. at 83). Another lawyer referred Affected Owner 1 to Aaronson, (id. at 13), and Affected Owner 1 does not recall ever visiting Aaronson's website, (id. at 15, 92).   The firm's own records,

however, reflect that Affected Owner 1 first contacted Aaronson through the website. (Doc. 131-6 at 14).

In July 2017, Affected Owner 2 converted her existing vacation interest to obtain interests in two timeshare units, "Condominium I" and "Condominium II." (Doc. 126-36 at 7). In October 2017, Affected Owner 2 failed to make her payment for Condominium II, and in January 2018, she failed to make the payment for Condominium I. (Id.). She did not retain Aaronson until February 2018, (Doc. 132-28 at 38), after she was referred to Aaronson by the same lawyer who referred Affected Owner 1, (Doc. 131-6 at 14).

In late 2016, Affected Owner 3 traded her existing timeshare interest as part of an upgrade to a new club ownership vacation interest. (Schupp Dep., Doc. 126-2, at 21–22, 27). When she became unhappy with her upgrade, she repeatedly called Exploria about getting her original timeshare back and cancelling her new contract, but to no avail. (Id. at 51, 116). She then tried several times to contact the Exploria employee who sold her the upgrade, but she was unable to reach her. (Id. at 117–18). At that point, she hired Aaronson in January 2018. (Doc. 126-19 at 2). She stopped making required payments to Exploria that same month. (Doc. 126-36). The lawyer who referred Affected Owners 1 and 2 to the Aaronson Firm also referred Affected Owner 3. (Doc. 126-2 at 62). After receiving the referral, Affected Owner 3's co-owner husband visited Aaronson's website, but the deposed owner herself did not, and her husband did not provide any specifics to her about the site. (Id.). Aaronson did not tell her to stop making loan or maintenance fee payments. (Id. at 88–89).

Affected Owner 4 hired Aaronson in 2018 in relation to two vacation interest purchases that he made in June 2017. (Doc. 126-36 at 8; Doc. 126-8 at 5). The same

lawyer who referred the first three owners also referred Affected Owner 4.  (Doc. 131-6 at 14).

Affected Owner 5 purchased a vacation interest in August 2015, but she failed to make the required payment the following month and soon hired Aaronson.  (Doc. 126-8 at 6).  Unlike the other owners, Affected Owner 5 was not referred to Aaronson by another lawyer; she learned of the firm through one of its websites.  (Doc. 131-6 at 14).

Affected Owner 6 purchased a vacation interest in late 2016, (Doc. 126-36 at 9), hired Aaronson in early 2018, (Doc. 126-8 at 11), and failed to make the payment due to Exploria on May 1, 2018, (Doc. 126-36 at 9).  But she eventually made the late payment. (Doc. 132-28 at 38).  The same lawyer who referred Affected Owners 1 through 4 also referred Affected Owner 6.  (Doc. 131-6 at 14).

## II.   Legal Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Anderson, 477 U.S. at 248).  The Court must construe the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  Yet, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence,

and upon which the nonmovant relies, are 'implausible.'" <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 743 (11th Cir. 1996).

## III.     Discussion

### A.     Count I—Tortious Interference

Exploria first claims that Aaronson tortiously interfered with Exploria's contracts with Affected Owners 1, 2, 3, and 5 by instructing the owners to stop making loan and fee payments based on groundless contract rescission theories.   To prevail on a tortious interference claim under Florida law, a plaintiff must show that (1) a contract existed; (2) the defendant knew that the contract existed; (3) the defendant intentionally caused the contract to be breached; (4) there was no justification or privilege regarding the breach; and (5) the plaintiff suffered damages resulting from the breach.   <u>Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.</u>, 162 F.3d 1290, 1321 (11th Cir. 1998) (citing <u>Fla. Tel. Corp. v. Essig</u>, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)).

Exploria satisfies the first two elements of its tortious interference claim because Exploria had contracts with the Affected Owners and Aaronson knew of those contracts. Exploria then skips to the fourth element, focusing on whether the legal theories advanced by Aaronson rendered the breaches justified or privileged.  But before that issue becomes relevant, Exploria must establish that Aaronson intentionally caused the breaches. Exploria's argument on this point hinges on its assertion that Aaronson instructed the Affected Owners to stop paying and the owners relied on this advice.  Aaronson argues that Exploria fails to satisfy the third element because the record evidence does not show

that Aaronson advised the Affected Owners to stop paying their obligations.[4]  Aaronson is correct that Exploria's claim fails at the third element.

Although Exploria asserts that Aaronson instructed the six Affected Owners to stop paying, there is no evidence that Aaronson did so or that he otherwise caused the owners to believe that they no longer needed to make payments.  In support of its argument, Exploria cites testimony given by Kenneth Feldman in unrelated litigation.  (Doc. 129 at 24–25).  Feldman was an Aaronson client, and Aaronson advised Feldman to cease making payments as a part of its legal strategy to terminate Feldman's timeshare ownership.  (Doc. 132-26).  The problem with this argument is that Feldman did not purchase a timeshare interest from Exploria; he was a member of Diamond Resorts.  Furthermore, the record does not establish when Aaronson advised Feldman.  This argument is thus tenuous at best.[5]

Exploria also relies on the temporal proximity of some Affected Owners' breaches to their hiring of Aaronson.  But, only Affected Owners 1 and 4 definitively stopped paying Exploria after hiring the firm.  (Doc. 132-28 at 37–38).  Affected Owners 2 and 5 stopped paying before engaging Aaronson.  (Id. at 37–38).  Affected Owner 3 stopped paying the same month that she hired the firm.  (Id. at 37).  And Affected Owner 6 missed her first payment after signing the firm but later made that payment.  (Id. at 38).  The fact that Affected Owners 1 and 4 stopped paying after hiring Aaronson is not enough to convince

---

[4] Aaronson also argues that punitive damages would be improper because even if the firm did advise the Affected Owners to cease payments, the breaches were for a proper purpose as they were part of the firm's legal strategy.  Because the tortious interference claim fails on other grounds, the Court does not reach this issue.
[5] Exploria asks the Court to infer that Aaronson must have given this same advice the Affected Owners.  The Court rejects this invitation.

a reasonable jury that Aaronson intentionally caused the Affected Owners to breach their contracts.

Further, deposition testimony directly contradicts Exploria's assertions regarding the cause of the breaches.  Affected Owners 1 and 3—the only Affected Owners who were deposed—both testified that no one from the law firm told them to stop making loan or fee payments.[6]  These two owners also elaborated that they already thought that they had grounds to cancel their contracts before contacting Aaronson, (Doc. 126-2 at 66; Doc. 126-15 at 15; Doc. 126-16 at 1-2), that they chose to stop paying for other reasons, (Doc. 126-2 at 70; Doc. 126-15 at 83), and that letters Aaronson sent to Exploria on their behalf did not lead them to believe that they had been relieved of their payment obligations, (Doc. 126-2 at 85-86; Doc. 126-15 at 74).   This testimony is contrary to all of Exploria's speculative contentions.

Exploria has submitted copies of several Aaronson retainer agreements, many of which state: "To avoid the possibility of a counterclaim, it is important that you remain current on your payments with the developer."  (Doc. 132-29 at 2–9, 14, 16, 21, and 23).  These documents clearly contradict Exploria's assertions.  (Doc. 126-22 at 35, 76; Doc. 126-17; Doc. 126-19).

---

[6] Exploria urges the court to draw a negative inference from the testimony of owners who denied that Aaronson advised them to cease making payments to Exploria, arguing Aaronson is using the assertion of the attorney-client privilege as a sword instead of a shield.  There is no merit to this argument.  Aaronson instructed Affected Owner 1 not to answer, but he chose to ignore the instruction and answered the question.  (Doc. 126-15 at 84:8–11).  In Affected Owner 3's deposition, Aaronson objected to the form of the question but did not instruct Affected Owner 3 not to answer.  (Doc. 126-2 at 88–89).  And her answer matched that of Affected Owner 1—the only other Affected Owner who was deposed.  Thus, the attorney-client privilege, to the extent it was referenced, did not result in the selective disclosure of self-serving information.

Exploria argues that "[t]his case is factually similar to" <u>Westgate Resorts, Ltd. v. Sussman</u>, 387 F. Supp. 3d 1318 (M.D. Fla. 2019).  (Doc. 129 at 24).[7]  But the facts of <u>Westgate</u> are indeed different from those of this case.  The <u>Westgate</u> record was replete with evidence of the lawyer's direction to timeshare owners to stop paying their timeshare obligations, as well as letters the lawyer sent to timeshare owners stating that they had been successfully relieved of their timeshare obligations even though the lawyer was aware that that was legally incorrect.   387 F. Supp. 3d at 1327–32, 1336, 1337, 1339–46. The court found that the lawyer's directions to owners to stop payments, "under the guise that doing so will rid them of their timeshares, [were] fraudulent and wrongful." <u>Id.</u> at 1353. There was also evidence that the lawyer's four methods to relieve owners of their timeshares did not work, and when they did not, the lawyer abandoned his clients. <u>Id.</u> at 1327–32, 1336, 1337, 1338–45.  In fact, the lawyer expressly declined in his retainer agreement to represent the owners in any lawsuit should they be sued by Westgate for failure to pay. <u>Id.</u> at 1332.

Those facts are simply not present here.[8]  Exploria has failed to present evidence creating a genuine issue of material fact regarding whether Aaronson advised the Affected Owners to stop paying on their obligations.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on

---

[7] Notably, in their Response (Doc. 158), in reference to another order from that litigation, Exploria states that "[t]he <u>Westgate</u> holding should be limited to the facts of that case." (Doc. 158 at 16).

[8] Interestingly, the <u>Westgate</u> opinion points out that one of the lawyer's clients later hired Aaronson to fix the mess Sussman had made, and Aaronson did in fact—after a year and a half of litigation—resolve the problem for the client. <u>Westgate</u>, 387 F. Supp. 3d at 1345.

a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  Here, because Exploria has not put forth evidence that Aaronson intentionally caused any of the Affected Owners' breaches—in the form of instructing them to cease paying or causing them to believe they could cease paying—Exploria's tortious interference claim fails.  Accordingly, the Court will grant summary judgment in favor of Aaronson on Exploria's tortious interference claim.

**B.     Count III—FDUTPA**

Exploria next alleges that Aaronson's website statements violate FDUTPA, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.  FDUTPA defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." § 501.203(8), Fla. Stat.

Aaronson asserts that Exploria may not bring a FDUTPA claim because (1) Exploria is not a consumer and (2) Exploria's claim involves Aaronson's practice of law, which is not "trade or commerce."  Because the Court agrees that Aaronson is not engaged in "trade or commerce," Exploria's FDUTPA claim does not survive summary judgment.

      *1.          Non-Consumers*

Aaronson's first argument—that as non-consumers Exploria lacks statutory standing to bring a FDUTPA claim—fails because it does not reflect the current state of the law.  In 2001, the Florida legislature amended FDUTPA to broaden the category of claimants from "consumer[s]" to "person[s]." <u>Caribbean Cruise Line, Inc. v. Better Bus.</u>

<u>Bureau of Palm Beach Cnty., Inc.</u>, 169 So. 3d 164, 169 (Fla. 4th DCA 2015).[9]   Although there was some post-amendment disagreement among courts as to whether non-consumers could bring FDUTPA claims, Florida state courts are now in general agreement that the right to bring a FDUTPA claim is not limited to consumers.  <u>See id.</u> at 168–69 (discussing federal district court decisions in Florida and choosing to follow the line of cases deciding that non-consumers may bring claims); <u>CWELT-2008 Series 1045 LLC v. PHH Corp.</u>, No. 1:20-cv-20334-BLOOM/Louis, 2020 U.S. Dist. LEXIS 91899, at *14 n.5 (S.D. Fla. May 27, 2020) (discussing that, at least since 2014, all Florida state courts have uniformly ruled that non-consumers may bring FDUTPA claims).  Aaronson's first argument for summary judgment on this claim is without merit.

2.      <em>Trade or Commerce</em>

Exploria bases its FDUTPA claim on the theory that Aaronson's website advertisements led the Affected Owners to hire Aaronson to improperly cancel their timeshare contracts.  Aaronson concedes that its website advertising, if unconnected with the practice of law, may constitute "trade or commerce."  But Aaronson maintains that the website statements and legal advice are necessarily part of the same legal theory presented by Exploria and that because the combined conduct relates to Aaronson's practice of law, it is not actionable under FDUTPA.  Aaronson is correct; because the conduct that Exploria puts at issue here is the exercise of a legal remedy, Exploria's claim fails.

---

[9] <u>See also</u> <u>Niles Audio Corp. v. OEM Sys. Co.</u>, 174 F. Supp. 2d 1315, 1319–20 (S.D. Fla. 2001); <u>Gov't Emps. Ins. Co. v. Clear Vision Windshield Repair</u>, No. 6:16-cv-2077-Orl-28TBS, 2017 U.S. Dist. LEXIS 47353, at *9 (M.D. Fla. Mar. 29, 2017).

Lawyers are not *per se* exempt from FDUTPA.  Kelly v. Palmer, Reifler, & Assocs., P.A., 681 F. Supp. 2d 1356, 1371 (S.D. Fla. 2009).  The focus of the "trade or commerce" inquiry as to lawyers is on the specific conduct at issue.[10]  Lawyers acting to exercise a legal remedy are typically not considered to be engaged in trade or commerce.  Kurlander v. Kaplan, No. 8:19-cv-00742-T-02AEP, 2019 U.S. Dist. LEXIS 141877, at *27 (M.D. Fla. Aug. 21, 2019).

Despite Exploria's insistence otherwise, Aaronson's website advertising and representation of clients is in pursuit of a legal remedy such that it does not fall within FDUTPA.  As previously mentioned, Aaronson signs retainer agreements with his clients.  These agreements, like the website advertising, identify specific steps that Aaronson will take to help the client and state that Aaronson will defend the client if the matter goes to litigation.  (Id.; Docs. 126-17 & 126-19).  Austin or someone from his staff interviews the clients to obtain the facts of each client's case.  (Doc. 126-22 at 37, 42, 49; Doc. 126-7).  And, as outlined on the website, Aaronson sends letters to developers on behalf of clients.  (Doc. 126-22 at 42–44).  If Aaronson is unable to obtain a resolution through negotiations, the firm pursues either arbitration or litigation for the clients, as the website claims.  (Doc. 126-22 at 67, 80, 90–91; Doc. 126-7 at 8).

Of the roughly 1,500 timeshare cases Aaronson has handled, about 100–150 went to litigation.  (Doc. 126-22 at 35).  Of those 100–150, the contracts were found

---

[10] Kelly v. Palmer, Reifler, & Assocs., P.A., 681 F. Supp. 2d 1356, 1375 (S.D. Fla. 2009) (concluding that a lawyer sending pre-suit demand letters was not engaged in "trade or commerce"); State, Office of Att'y Gen. v. Shapiro & Fishman, LLP, 59 So. 3d 353, 355, 357 (Fla. 4th DCA 2011) (holding that lawyer conduct in the processing of foreclosure cases was not "trade or commerce"); CK Regalia, LLC v. Thornton, 159 So. 3d 358, 360 n.2 (Fla. 3d DCA 2015) (noting that trial court's dismissal of a claim that a retainer agreement violated FDUTPA was correct because it failed to state a cause of action).

unenforceable at least six times, (id. at 59), approximately six rulings were unequivocally against Aaronson's clients, (id. at 62), and most others settled, (id. at 62–63).[11]  Specific to the Affected Owners, Aaronson has filed suit against Exploria on behalf of Affected Owners 1 and 5.  (D'Agostino Am. Compl., Doc. 126-27; Picklesimer Transfer Agreement, Doc. 126-33).  As of the date of Exploria's motion, Affected Owner 1's case was pending, and Aaronson had settled Affected Owner 5's case.  (D'Agostino Order, Doc. 126-27; Doc. 126-33).  Clearly, Aaronson has not avoided judicial involvement while handling clients' cases.

Again, this directly contrasts to the actions of the lawyer in Westgate.[12]  Based on the facts of that case, the court determined that the defendant was engaged in "trade or commerce" because "[the lawyer's] actions [were] not aimed at petitioning the government to redress aggrieved owners' rights; rather, he actively avoid[ed] judicial involvement through all of his work."  Westgate, 387 F. Supp. 3d at 1365 n.31.

Here, Aaronson's website advertising and actions were in pursuit of a civil legal remedy.  Based on the record evidence, the Court concludes that Aaronson's conduct was not "trade or commerce" under FDUTPA.  Accordingly, summary judgment must be granted in Aaronson's favor on Exploria's FDUTPA claim.

---

[11] Exploria twists these facts as follows: "When asked about the firm's success rate, [Austin] recalled that out of the approximately 100–150 cases that were litigated, an arbitrator or court of law found the timeshare agreement to be unenforceable **six times**. . . . In other words, arbitrators and courts of law alike, 95–96% of the time found that the timeshare agreement [sic] were **enforceable and binding**." (Doc. 129 at 16–17 (emphasis in original)).

[12] In its Response, Exploria states: "However, as this Court has previously noted, the services that Defendants offer do not involve the exercise of a legal remedy and, thus, Defendants are appropriately deemed as engaged in 'trade or commerce.'" (Doc. 158 at 21). Exploria bases this statement on the Westgate decision. Id. Westgate did not involve these Defendants or these facts.

## C.  Count IV—Lanham Act

Exploria next asserts that Aaronson's website statements constitute false advertising in violation of the federal Lanham Act.  The Lanham Act states:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . . false or misleading description of fact, or false or misleading representation of fact, which—
>> . . . .
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  Aaronson first argues that Exploria lacks statutory standing to bring a Lanham Act claim because it has not alleged reputational harm and its damages were not proximately caused by Aaronson's website advertisements.

### 1.  Statutory Standing

"[W]hen standing is raised at the summary judgment stage, the plaintiff can no longer rest on 'mere allegations,'" but rather "must 'set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true.'" Bischoff v. Osceola Cnty., 222 F.3d 874, 878 (11th Cir. 2000) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  A Lanham Act cause of action "extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  "[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." Id. at 131–32.  This means that "a plaintiff must plead (and

ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." Id. at 140.

Although Exploria has not alleged reputational harm, it has alleged an injury to a commercial interest in sales—loan and fee payments owed by the Affected Owners. See Diamond Resorts Int'l, Inc. v. Aaronson, 371 F. Supp. 3d 1088, 1102 (M.D. Fla. 2019) (finding that the unpaid obligations along with the lost customers who owed the obligations constituted "lost sales"). Exploria provided an expert report detailing the loan and fee amounts owed to it by the owners. (Doc. 132-28). Looking at this evidence in the light most favorable to Exploria, there are reasonable inferences that Exploria lost sales sufficient for Exploria to come within the Lanham Act's zone of interests.

Finding that Exploria is within the zone of interests, however, does not end the inquiry as to standing. "A statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." Lexmark Int'l Inc., 572 U.S. at 132. That is, a plaintiff "must show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising; and . . . that occurs when deception of consumers causes them to withhold trade from the plaintiff." Id. at 133 (emphasis added). "[A]t a minimum Lexmark International, Inc. requires that, at the summary judgment stage, a plaintiff must provide some evidence from which a reasonable juror could conclude that its injuries were proximately caused by the defendant." Snac Lite, LLC v. Nuts 'N More, LLC, No. 2:14-cv-01695-RDP, 2016 U.S. Dist. LEXIS 158328, at *44–45 (N.D. Ala. Nov. 16, 2016) (citing Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V., 69 F. Supp. 3d 175, 216 (D.D.C. 2014)). Exploria fails to meet this standard.

Exploria's expert report presumes causation and calculates damages based on a comparison of the date the Exploria owners retained Aaronson and the date that they ceased making payments to Exploria. But, as discussed *supra*, the record evidence does not show that the Affected Owners retained Aaronson because of its websites, or that Aaronson directed the owners to stop making payments to Exploria. To the contrary, both of the Affected Owners who were deposed in this case affirmed that they retained Aaronson without ever seeing the website and that no one from Aaronson advised them to stop making payments to Exploria. And the expert report does not create a genuine issue of fact as to whether the nonpayment was caused by Aaronson. Having failed to establish that nexus, Exploria has no standing under the Lanham Act.

2.   *Elements of a Lanham Act Claim*

The Court nonetheless will address the first three elements of a Lanham Act claim and their application in this case. An injured plaintiff who falls within the protections of the Lanham Act must establish the following elements to prevail on its claim: "(1) the defendant's advertisements were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been injured as a result of the false advertising." Intertape Polymer Corp. v. Inspired Techs., Inc., 725 F. Supp. 2d 1319, 1332 (M.D. Fla. 2010).

Exploria maintains that it is entitled to summary judgment because Aaronson's false and misleading advertisements "systematically misled consumers into believing they could escape their financial obligation to pay their timeshare fees, and ultimately rescind a legally binding and enforceable contract with [Exploria]." (Doc. 129 at 33). Exploria alleges that

19

the advertisements are false and misleading because they used content like fake client testimonials, manufactured stories of negative timeshare experiences, strategies purporting to give consumers the best chance of rescission, and accusations of sociopathic and unempathetic timeshare industry professionals to convince timeshare owners that they could hire Aaronson to rescind their timeshare contracts and stop paying, regardless of the merits of their cases or Aaronson's actual historical success for its clients. Exploria explains that this conduct caused it to suffer damages in the form of lost streams of payments from the Affected Owners.   Aaronson, on the other hand, contends that Exploria cannot succeed on its Lanham Act claim because it has not presented the evidence of deception or materiality that is needed to support a claim based on advertisements that are literally true but misleading.

### a.   Falsity

"The first element of a false advertising claim is 'satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading.'" Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002)). "When determining whether an advertisement is literally false or misleading, courts 'must analyze the message conveyed in full context,' and 'must view the face of the statement in its entirety.'" Osmose, 612 F.3d at 1308 (quoting Johnson & Johnson, 299 F.3d at 1248). Here, genuine issues of material fact remain regarding whether the asserted website statements are false or misleading.

Aaronson's websites accuse timeshare developers of nefarious actions, using descriptions such as "fraud," "pack of lies," "improper handling of trust funds," sociopathic

sales associates, "ongoing conflicts of interest," and the owners "being taken for a ride." The veracity of the statements maligning the whole industry cannot be determined here.

Additionally, there is record evidence that the sites' claims that the timeshare developers are likely "exposed legally in ways that are relatively straightforward and provable" and that Aaronson's strategies give timeshare owners "the best chance to have [their] timeshare successfully rescinded" are false. Austin testified that, of the 100–150 timeshare cases he has taken to litigation, the contracts were found unenforceable roughly six times. And there is no record evidence that any of the Affected Owners' contracts were successfully rescinded. This is not to say that the Affected Owners had no legal grounds to dispute their timeshare agreements, or that Aaronson has not successfully obtained settlements for some of them. But record evidence exists that could lead a jury to find that Aaronson's website falsely or misleadingly stated timeshare developers' legal vulnerability as well as the availability of remedies like rescission.

For the foregoing reasons, summary judgment is not appropriate on the issue of falsity.

### b.   Deception

Whether Aaronson's advertisements are "literally false" or "literally true but misleading" determines Exploria's requirement to prove the second Lanham Act element—deception. If an advertisement is literally false, the plaintiff "need not present evidence of consumer deception." Johnson & Johnson, 299 F.3d at 1247. On the other hand, if the advertisement is literally true but misleading, the plaintiff must present evidence "that the relevant consumer population was actually deceived." Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1347 (M.D. Fla. 2006) (citing Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc., 270 F.3d 298, 323 (6th Cir. 2001)). "Eleventh Circuit precedent requires the

plaintiff to present evidence of deception in the form of consumer surveys, market research, expert testimony, or some other appropriate form." Id. (citing Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260–61 (11th Cir. 2004)).

Falsity is critical for Exploria because it has not produced consumer surveys, market research, expert testimony, or other evidence that the advertisements actually deceived the Affected Owners—or any Exploria owners, for that matter.[13] If the advertisements are literally false, deception becomes irrelevant.  But if the advertisements are true but misleading, Exploria's Lanham Act claim collapses because Exploria has not established the deception element.  Thus, because a genuine issue of material fact exists as to falsity, deception is not dispositive at this stage.

### c.   Materiality

As with deception, Exploria has not presented evidence of the third element of its Lanham Act claim—that any deception had a material effect on purchasing decisions.  This is fatal to Exploria's Lanham Act claim.  Evidence of materiality must be proffered whether an advertisement is false or "true but misleading." Johnson & Johnson, 299 F.3d at 1250. A plaintiff must "establish 'that the defendant's deception is likely to influence the purchasing decision.'" Id. (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002)).  One method of establishing materiality is "by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" Id. (quoting Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997)).

---

[13] In fact, Exploria does not attempt to refute Aaronson's assertion that no evidence of deception has been presented.  Instead, Exploria responds that evidence of deception is not required because the advertisements are literally false.

Here, Exploria has not presented any expert testimony or other evidence to support its contention that the website advertisements were likely to be material to consumer purchasing decisions.  Exploria simply asserts in a single, conclusory sentence that it would be difficult to argue that the alleged falsities would not influence the purchasing decisions of Exploria customers.  Exploria then repeats the same debunked claim that all of the Affected Owners found Aaronson through the websites. And later, in a footnote to its reply brief, Exploria argues that evidence that the Affected Owners found Aaronson through the websites is evidence of the materiality element. See Diamond Resorts, 371 F. Supp. at 1108–09.  But even assuming this would be evidence of materiality, Exploria has not presented such evidence.

Although Exploria confidently asserts that every owner found Aaronson through its websites, as discussed earlier, the record soundly contradicts this assertion.  Affected Owner 5 is the only Affected Owner who found Aaronson through an Aaronson website. But Affected Owner 5 was not deposed in this case, and there is no other evidence that she viewed—or took any action because of—the allegedly false or misleading advertisements.  Further, Exploria apparently suffered no damages attributable to Affected Owner 5 because she was left out of the expert's damages report.

And even viewing the evidence in the light most favorable to Exploria that Affected Owner 3's spouse and Affected Owner 1 may have visited an Aaronson website, there is still no evidence of material effect.  Both Affected Owners 1 and 3 were referred to Aaronson by an outside lawyer before ever being exposed to the website.  Affected Owner 1 has no recollection of visiting the site.  And Affected Owner 3's spouse told her nothing about the site.  Clearly the website statements were not material to these owners even if

they did indeed view them.  And although Aaronson admits that a link to the site is included in the post-intake email to new clients, there is no evidence that any owner followed the link or took any action—hiring Aaronson or ceasing payments to Exploria—because of the site content.

Quite simply, Exploria has not presented evidence that the advertisements and alleged deception were likely to influence the purchasing decisions of consumers or "had a material effect on the purchasing decisions of any consumer."  Gibson v. Resort at Paradise Lakes, LLC, No. 8:16-cv-791-T-36AAS, 2018 U.S. Dist. LEXIS 80471, at *46 (M.D. Fla. Feb. 2, 2018).  Thus, this is an alternative basis for granting summary judgment in Aaronson's favor on Exploria's Lanham Act claim.

D.    **Count V—Trade Libel**

Finally, Exploria claims that Aaronson's website statements amount to trade libel in violation of Florida law.  To establish a Florida trade libel claim, a plaintiff must show that "(1) a falsehood; (2) has been published, or communicated to a third person; (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff; (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood."  Border Collie, 418 F. Supp. 2d at 1348.

As with the Lanham Act claim, Aaronson challenges Exploria's trade libel claim by asserting that the advertisements did not "play a material and substantial part in inducing"

24

the owners not to deal with Exploria.[14]   Exploria did not move for summary judgment on this claim, and its only responses to Aaronson's motion were a couple of short footnotes in which it did not address all of Aaronson's arguments.   Indeed, Exploria's retort to Aaronson's trade libel materiality argument is a one-sentence footnote citing its one-sentence, conclusory materiality argument in the Lanham Act section of its response brief—an argument that has already been rejected by the Court earlier in this Order. Exploria has presented no evidence that the website advertisements materially influenced the Affected Owners' decisions to cease making loan and fee payments to Exploria. Because Exploria did not present evidence on an element of its trade libel claim, the claim fails and summary judgment is granted in Aaronson's favor.

## IV.   Conclusion

It is hereby **ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. 126) is **GRANTED**. [15]

2. Plaintiffs' Motion for Summary Judgment (Doc. 129) is **DENIED.**

3.   The Clerk is directed to enter a judgment that Plaintiffs take nothing from Defendants on the claims in this case. After entering judgment, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, on November **10** 2020.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

---

[14] Aaronson argues that Exploria's future maintenance fees do not constitute special damages and Exploria has not shown that they are entitled to punitive damages. The Court does not reach these arguments because the trade libel claim fails on its merits.
[15] Aaronson also contends that damages from non-payment of maintenance fees—past and future—are not recoverable as to all counts because the fees are not paid to either plaintiff, but rather to Club Exploria Association, Inc.  Because all of Exploria's claims fail, the Court does not reach this issue.